In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3689

IN RE: ARCHDIOCESE OF MILWAUKEE,

*Debtor-Appellee,*

*v.*

APPEAL OF: JOHN DOE, Claimant A-49,

*Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 12-C-292 — **Rudolph T. Randa**, *Judge.*

ARGUED APRIL 17, 2013 — DECIDED FEBRUARY 25, 2014

Before WOOD, *Chief Judge*, and EASTERBROOK and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. This appeal challenges the disallowance of a claim in the ongoing Chapter 11 bankruptcy reorganization of the Archdiocese of Milwaukee. John Doe Claimant A-49 alleges that Father David Hanser, a former pastor at St. John Vianney Catholic Parish in Brookfield,

Wisconsin, sexually abused him in the late 1970s when he was seven years old.[1] In 2007 the claimant participated in a voluntary mediation program conducted by the Archdiocese to address claims of sexual abuse by priests. The mediation produced a settlement; the Archdiocese paid the claimant $100,000, and he signed an agreement releasing the Archdiocese from all claims relating to abuse by Father Hanser.

When the Archdiocese filed its Chapter 11 petition four years later, however, Claimant A-49 submitted a claim based on the same allegations of abuse by Father Hanser. The Archdiocese moved to disallow it based on the release. In response the claimant asserted that an Archdiocesan representative had fraudulently induced him to settle by giving him misleading information about when the Archdiocese first received reports of abuse by Father Hanser. The bankruptcy judge refused to set aside the agreement because the claimant had not shown that but for the alleged misrepresentations, he would not have accepted the settlement. The judge enforced the release and entered summary judgment disallowing the claim. The district court affirmed.

We likewise affirm, although on a somewhat different analysis. The courts below misstated the elements of a claim for rescission based on fraudulent inducement under Wisconsin law. To be fair, the Wisconsin Supreme Court has never addressed the precise question presented here, but its

---

[1] The bankruptcy judge overseeing the Chapter 11 issued a standing order that claimants alleging clergy abuse may be publicly identified by number rather than name to protect their confidentiality. The parties have followed that practice, and we will as well.

approach to the remedy of rescission has long followed the *Restatement (Second) of Contracts*, and under that framework the lower courts reached the right result. Claimant A-49 failed to show that the alleged misrepresentations were a substantial factor in his decision to accept the settlement. The claimant's lawyer argues that the bankruptcy judge wrongly refused his request to supplement the record with oral testimony or a second affidavit from his client. We find no abuse of discretion. Counsel never made an offer of proof explaining what the expanded record would show, nor has he told us what his client would say in these additional forms of proof.

## I. Background

We recount the factual background from the record before the bankruptcy court on the summary-judgment motion, construing the facts and drawing inferences in favor of the claimant. *In re United Air Lines, Inc.*, 438 F.3d 720, 727 (7th Cir. 2006). Claimant A-49 alleges that Father Hanser sexually abused him in 1977 or 1978, when he was seven years old. At the time, Father Hanser was the pastor of St. John Vianney Parish in the Milwaukee Archdiocese. In 2007 the Archdiocese conducted a voluntary mediation program to address claims of sexual abuse by its priests. Claimant A-49 participated in this program. Barbara Anne Cusack represented the Archdiocese in the mediation.

During the course of his mediation session, Claimant A-49 asked Cusack when the Archdiocese first received a complaint of sexual abuse by Father Hanser. She replied that the first report arose in the mid- to late-1980s. Claimant A-49 then

asked her whether the Archdiocese had received reports from other victims of abuse by Father Hanser while he served at St. John Vianney. Cusack said there were none.

At the conclusion of the mediation, the parties reached an agreement to settle the claim. The Archdiocese agreed to pay the claimant $100,000 and to cover certain expenses for counseling and other services. In return the claimant released the Archdiocese from all claims relating to abuse by Father Hanser. The release provision in the settlement agreement states as follows:

> In return for the payments set out above, and for the mutual promises contained herein, [Doe] releases and forever discharges the Archdiocese, and all of the Archdiocese's employees, agents, officers, directors, affiliates, insurers and assigns, including, without limitation, all members of the Roman Catholic clergy, and all parishes and schools and any person or entity affiliated with the Archdiocese of Milwaukee from, and covenants not to sue them for, all claims, causes of action, charges, and demands, whether in tort, contract, or otherwise, of any nature that he may have had at any time up to and including the date of signing of this Agreement, including, without limitation, any claim of any nature arising from the assault, injury, whether physical or mental, or any other activity by Hanser.

Claimant A-49 and Cusack signed the agreement on January 10 and 12, 2007, respectively.

Four years later, in January 2011, the Archdiocese filed for Chapter 11 bankruptcy due to mounting claims of clergy sexual abuse. During the reorganization proceedings, information came to light showing that the Archdiocese was in possession of allegations that Father Hanser sexually abused a child in the 1970s and sexually abused other children while he was assigned to St. John Vianney. These disclosures contradicted the information Cusack provided during the mediation session.

Although he had settled his claim and released the Archdiocese from further liability, Claimant A-49 filed a claim in the bankruptcy seeking recovery for the abuse by Father Hanser. The Archdiocese objected and moved to disallow the claim based on the release. *See* 11 U.S.C. § 502(b)(1) (providing that a claim may be disallowed if "such claim is unenforceable against the debtor … under any agreement or applicable law").[2]

Claimant A-49 responded that the Archdiocese had fraudulently induced him to settle and sought to void the settlement agreement. He submitted an affidavit recounting the statements Cusack made during the mediation session in response to the questions he raised about the Archdiocese's knowledge of prior incidents of abuse by Father Hanser. In the affidavit he attested that "[b]oth of [Cusack's] answers were very important to me." He also said that at the time of the

---

[2] The Archdiocese also asserted that the claim was barred by the applicable statutes of limitations, but the bankruptcy court had no need to address that argument and neither do we.

mediation, he was a practicing, faithful Catholic and "believed that the Archdiocese and the people associated with the Archdiocese had my best interests at heart." Finally, he said that he "believed that Barbara Cusack was telling the truth during [the] mediation when I asked her about Hanser's history and other abuse at St. John Vianney."

The bankruptcy judge held a hearing and closely questioned counsel about the claim of fraudulent inducement. Because the claimant sought to rescind the settlement agreement, the judge inquired whether he would have to return the $100,000 payment in order to proceed with his claim in the Chapter 11. But most of the judge's attention was focused on whether the claimant had actually relied on the alleged misrepresentations in deciding whether to settle. In his affidavit Claimant A-49 never asserted that but for Cusack's statements, he would not have accepted the offer of settlement. Rather, he said only that Cusack's statements were "very important" to him. The judge thought that was not enough.

Responding to the court's inquiry, counsel for Claimant A-49 asked to present oral testimony or a second affidavit from his client. But he did not make an offer of proof about what his client would say, and the judge declined to allow supplementation of the record. At the end of the hearing, the judge delivered an oral ruling finding insufficient evidence of reliance and disallowing the claim based on the release language in the settlement agreement, which she found valid and enforceable.

The judge followed up with a written decision detailing her reasons for disallowing the claim. She explained that the

fraudulent-inducement claim required evidence that Claimant A-49 had relied on Cusack's representations to his detriment, but in his affidavit he never "state[d] that he relied on [Cusack's] statements in deciding to settle with the Debtor," and "[n]ot once does he allege that if he knew the statements were not true, he would not have entered into the Settlement Agreement." Instead, the claimant said only that he believed Cusack and that her statements were "very important" to him. That was insufficient evidence of reliance, the judge held. So the fraudulent-inducement claim failed for lack of proof of an essential element, and the judge granted summary judgment disallowing the claim.

The district court affirmed the bankruptcy judge's decision. The court agreed that the claimant "needed to produce specific evidence of detrimental reliance" and failed to do so. The court also held that the bankruptcy judge did not abuse her discretion in denying the request to supplement the record with oral testimony or a second affidavit. Claimant A-49 appealed.

## II. Discussion

Summary-judgment proceedings in bankruptcy court are governed by Rule 56 of the Federal Rules of Civil Procedure. *See* FED. R. BANKR. P. 7056; FED. R. BANKR. P. 9014(c); *Dick ex rel. Amended Hilbert Residence Maint. Trust v. Conseco, Inc.*, 458 F.3d 573, 577 (7th Cir. 2006). Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Dick*, 458 F.3d at 577. The substantive legal rules applicable to the claim are provided by state law. *See Travelers*

*Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450–51 (2007); *In re Lothian Oil Inc.*, 650 F.3d 539, 543 (5th Cir. 2011); *In re G.I. Indus., Inc.*, 204 F.3d 1276, 1281 (9th Cir. 2000). The parties agree that Wisconsin law applies. Our review is de novo. *Dick*, 458 F.3d at 577.

In Wisconsin, as elsewhere, a release is a contract. *See Peiffer v. Allstate Ins. Co.*, 187 N.W.2d 182, 185 (Wis. 1971). A contract induced by fraud is voidable at the option of the party whose assent was fraudulently induced. *See Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 244 (Wis. 2004); *Bank of Sun Prairie v. Esser*, 456 N.W.2d 585, 588 (Wis. 1990). For claims of rescission based on fraud in the inducement, the Wisconsin Supreme Court follows the rule set forth in the *Restatement (Second) of Contracts*: "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." RESTATE-MENT (SECOND) OF CONTRACTS § 164(1) (1981) [hereinafter RESTATEMENT]; *see First Nat'l Bank & Trust Co. of Racine v. Notte*, 293 N.W.2d 530, 538 (Wis. 1980) (adopting this formulation as it appeared in a tentative draft of the *Restatement (Second)*).[3]

---

[3] The state supreme court has not always spoken with perfect clarity on the subject. For example, in *Merten v. Nathan*, 321 N.W.2d 173 (Wis. 1982), the court framed the elements of fraudulent inducement of a contract as follows:

> The elements of fraudulent misrepresentation rendering a contract voidable are: (1) there must be a statement of fact which is untrue; (2) the false statement must be made with

(continued...)

In *Notte* the state high court also adopted the *Restatement*'s standards and definitions for several elements of the claim—notably, its definitions of "misrepresentation," "fraudulent misrepresentation," and "material misrepresentation." *See Notte*, 293 N.W.2d at 538 & n.7. A party seeking to rescind a contract based on fraudulent inducement must prove the claim by clear and convincing evidence, the same burden that applies to fraud claims sounding in tort. *See Daniel J. Hartwig Assocs. v. Kanner*, 913 F.2d 1213, 1221–22 (7th Cir. 1990) (applying Wisconsin law).

At issue here is the reliance element of the claim. To rescind a contract based on a fraudulent or material misrepresentation made during contract formation, the recipient must have justifiably relied on the misrepresentation in deciding to enter into the contract. *See Notte*, 293 N.W.2d at 538; RESTATEMENT § 164(1). The reliance inquiry thus involves two subsidiary questions: (1) Did the party actually rely on the misrepresentation? (2) If so, was the reliance justifiable?

---

[3] (...continued)

> intent to defraud and for the purpose of inducing the other party to act upon it; and (3) the other party must rely on the false statement and must be induced thereby to act to his injury or damage.

*Id.* at 176 n.2. This formulation suggests that the contract remedy for fraud in the inducement requires tort-like intent to defraud. But later the court explained that honest misrepresentations can support a claim of rescission, citing *Notte* and the *Restatement*. *Id.* Nothing in this brief discussion suggests the court was departing from its prior reliance on the *Restatement (Second) of Contracts*. *Notte*, which adopted the *Restatement*'s formulation of the claim, remains the law in Wisconsin.

7 Joseph M. Perillo, Corbin on Contracts § 28.15 (rev. ed. 2002).

Special standards govern when reliance is justifiable, *see* Restatement §§ 169–172, and Wisconsin courts regularly address whether a party's reliance was justified in specific circumstances, *see, e.g.*, *Notte*, 293 N.W.2d at 539; *Caulfield v. Caulfield*, 515 N.W.2d 278, 282–83 (Wis. Ct. App. 1994); *Ritchie v. Clappier*, 326 N.W.2d 131, 134–35 (Wis. Ct. App. 1982). Here, however, the dispute is about actual reliance; in other words, the issue for us is whether the alleged misrepresentations actually induced Claimant A-49 to manifest his assent to the settlement.

The Wisconsin Supreme Court has not addressed the standard that governs this aspect of a fraudulent-inducement claim. That's not unusual. As we've just noted, most disputes over reliance center on whether one party's reliance on a counterparty's misrepresentation during contract formation was justified. *See* Joseph M. Perillo, *The Origins of the Objective Theory of Contract Formation and Interpretation*, 69 Fordham L. Rev. 427, 473–74 (2000) ("Misrepresentation cases generally do not discuss the reliance factor. The focus of most of the cases is on the nature of the deception and the justification for any reliance."). In the absence of Wisconsin caselaw specifically addressing the actual-reliance question, our task is to predict how the Wisconsin Supreme Court would decide it. *See Intec USA, LLC v. Engle*, 467 F.3d 1038, 1040 (7th Cir. 2006); *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 390 (7th Cir. 2002) ("[T]he *Erie* doctrine applies to any case in which state law supplies the rule of decision … .").

The predictive inquiry is fairly straightforward here. For all other elements of the fraudulent-inducement claim, the state supreme court has followed the standards and definitions in the *Restatement (Second) of Contracts*. The *Restatement* contains a standard for evaluating the element of actual reliance, framing it as a question of causation:

> § 167 When A Misrepresentation Is An Inducing Cause
>
> A misrepresentation induces a party's manifestation of assent if it *substantially contributes* to his decision to manifest his assent.

RESTATEMENT § 167 (emphasis added). The commentary explains that in this context "but for," "sole," or even "predominant" causation is not required: "It is not necessary that this reliance have been the sole or even the predominant factor in influencing [the party's] conduct," nor is it "necessary that he would not have acted as he did had he not relied on the assertion." *Id.* cmt. a. Rather, it is enough that reliance on the misrepresentation "substantially contributed to his decision to make the contract."

The commentary also explains that "[t]he materiality of the misrepresentation is a particularly significant factor in [the] determination [of actual reliance]. It is assumed, in the absence of facts showing the contrary, that the recipient attached importance to the truth of a misrepresentation if it was material, but not if it was immaterial." *Id.* cmt. b. Leading contract treatises are in accord, *see* 1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 4.13 (3d ed. 2004); 27 RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 69:32 (4th ed.

2003); 7 PERILLO, *supra*, § 28.15, although one recognizes that there is some "authority for the view that the test of whether a party relied on [an]other party's misrepresentation is generally whether he would have acted in the absence of the representation," 27 LORD, *supra*, § 69:32.

We can safely predict that the Wisconsin Supreme Court would adopt the *Restatement*'s framework for evaluating actual reliance.[4] Nothing suggests that the court would suddenly depart from its established practice of looking to the *Restatement* to develop the elements of the rescission remedy for contracts induced by fraudulent or material misrepresentation.

The courts below, however, applied a different standard to evaluate reliance. Both judges rejected the rescission claim because Claimant A-49 failed to show that but for Cusack's representations, he would not have entered into the settlement agreement. That's too strict a standard. Still, the claim fails under the more generous standard of the *Restatement*.

Applying that standard here, we ask first whether the alleged misrepresentations were material. There are two aspects of materiality in this context, one objective and one subjective. *Notte*, 293 N.W.2d at 538. A misrepresentation is objectively material "if it is likely to induce a reasonable person to manifest his assent." *Id.* A misrepresentation is subjectively

---

[4] A similar standard applies in tort claims of misrepresentation. *See, e.g., First Nat'l Bank in Oshkosh v. Scieszinski*, 131 N.W.2d 308, 311 (Wis. 1964); *Household Fin. Corp. v. Christian*, 98 N.W.2d 390, 393 (Wis. 1959); *Darlington v. J.L. Gates Land Co.*, 138 N.W. 72, 74 (Wis. 1912); *see also* WIS. JURY INSTRUCTIONS–CIVIL 2401 (2011) (Misrepresentation: Intentional Deceit).

material if "the maker knows that it is likely that the recipient will be induced to manifest his assent by the misrepresentation." *Id.* The normal order of battle puts the objective inquiry before the subjective. *Notte* explains:

> The trier of fact must determine whether a reasonable person would be likely to assent to the contract on the basis of the misrepresentation. Second[], even when under the reasonable[-]person standard the misrepresentation would not have been material, it is possible that there were personal considerations which would induce the recipient to enter the contract. If the party making the misrepresentation knows of these special circumstances, the misrepresentation may be material even though it would not be expected to induce a reasonable person to enter the proposed contract.

*Id.*

Claimant A-49 has not developed an argument that Cusack's misrepresentations were objectively material. Instead, his argument relies entirely on his assertion that Cusack's answers to his questions about other reports of abuse by Father Hanser were "very important" to him emotionally, and that he believed her and thought the Archdiocese had his "best interests at heart … during the mediation." These generalized assertions about the emotional stakes of the mediation do not establish the kind of "special circumstances" that could support a conclusion that Cusack's misrepresentations were a

substantial factor in Claimant A-49's decision to accept the settlement.

We acknowledge that we are not confronted with ordinary contract negotiations here; the context is far more sensitive. We do not doubt that the mediation was extraordinarily difficult and emotionally wrenching for the claimant and that the atmosphere was one of trust rather than an arm's-length financial negotiation. We also accept, as we must, that Cusack's answers to the claimant's questions about other victims of abuse by Father Hanser were important to him as a subjective matter. But that's not enough by itself to show that Cusack's answers were a substantial factor in his decision to accept the settlement. When pressed on this point at oral argument, counsel for Claimant A-49 simply reiterated that Cusack's responses were important to his client emotionally; he never explained how they actually factored into his decision to accept the offer of settlement from the Archdiocese.

Although the claimant's counsel did not mention it, the Archdiocese's prior knowledge of abuse by Father Hanser may have loomed larger had the mediation occurred seven months later. In July 2007 the Wisconsin Supreme Court resolved unsettled timeliness questions for two legal theories under which the Archdiocese might be liable for abuse by its priests: negligent supervision and fraud. The court held that for negligent-supervision claims, the statute of limitations commences at the time of the last episode of sexual abuse. *See John Doe 1 v. Archdiocese of Milwaukee*, 734 N.W.2d 827, 834–39 (Wis. 2007). This ruling largely foreclosed the negligent-supervision theory for clergy-abuse claims against the Archdiocese; under

this accrual rule, many if not most claims are time-barred. But the court also held in *Doe 1* that fraud claims "based on the Archdiocese's alleged knowledge of the priests' prior sexual molestation of children" stated a cognizable theory of relief and could proceed. *Id.* at 846. The court applied the discovery rule to extend the limitations period for fraud claims stemming from clergy abuse, holding that "the date of the accrual … is when the plaintiffs discovered or, in the exercise of reasonable diligence, should have discovered that the Archdiocese's alleged fraud was a cause of their injuries." *Id.* at 846–47 (internal quotation marks omitted).

At the time of Claimant A-49's mediation, however, Wisconsin's statute-of-limitations jurisprudence was decidedly against him. The court of appeals had held in *Doe 1* that negligent-supervision *and* fraud claims accrue on the date of the last occurrence of sexual abuse. *See Doe 1 v. Archdiocese of Milwaukee*, No. 2005AP1945, 2006 WL 2472821, ¶¶ 13-15 (Wis. Ct. App. Aug. 29, 2006), *aff'd in part, rev'd in part*, 734 N.W.2d 827 (Wis. 2007). Although the state supreme court later reversed this accrual rule for fraud claims, at the time of Claimant A-49's mediation, he was faced with a stark choice: (1) accept the $100,000 settlement offer; or (2) take his chances that *Doe 1* would be reversed and then attempt to mount his own claim for fraud, with all the attendant risks and uncertainties of litigation.

Counsel for the claimant has not explained how, when considered in this light, Cusack's answers to his client's questions about other victims of Father Hanser's abuse substantially affected his decision to accept the offer of

settlement. Indeed, all the inferences run against his position. Whether the Archdiocese had prior knowledge of other victims of Father Hanser's abuse would be potentially important to a future fraud claim *if* the Wisconsin Supreme Court reversed the court of appeals in *Doe 1* and *if* the claimant could overcome the statute of limitations and *if* all the other factual and legal predicates for a successful fraud claim were present. In other words, at the time of the mediation, the viability of any future fraud claim was highly contingent and quite uncertain; the settlement offer, on the other hand, was definite and favorable to the claimant.

The claimant's counsel insists that he could have bolstered the record of his client's reliance but the bankruptcy judge wrongly precluded him from presenting oral testimony or a supplemental affidavit. This argument fails for several reasons.[5] First, trial courts have considerable discretion in managing the course of litigation, *see Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012); *FEC v. Al Salvi for Senate Comm.*, 205 F.3d 1015, 1018 (7th Cir. 2000), and this is no less true in the context of summary-judgment motions. When a

---

[5] Embedded in this argument is a procedural objection: Claimant A-49 complains that the Archdiocese failed to address the reliance issue until its reply brief. But the Archdiocese was not required to anticipate the fraudulent-inducement argument, which did not come into play until Claimant A-49 raised it in his brief in opposition to summary judgment. The Archdiocese replied that there was no evidence showing reliance, as necessary for fraud in the inducement. That was the proper order of events.

party fails to support a factual assertion in connection with a motion for summary judgment, the court can

> (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

FED. R. CIV. P. 56(e).

Although Rule 56 is silent about oral testimony, it plainly contemplates the use of affidavits and documentary evidence. *See Seamons v. Snow*, 206 F.3d 1021, 1025 (10th Cir. 2000); *see also Stewart v. RCA Corp.*, 790 F.2d 624, 628 (7th Cir. 1986) ("Rule 56(c) suggests that the decision should be made on affidavits and documentary evidence … ."). More generally, Rule 43 provides that "[w]hen a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions." FED. R. CIV. P. 43(c). Based on the predecessor to Rule 43(c), we have held that although the court has the discretion to receive oral testimony in connection with a motion for summary judgment under Rule 56, oral testimony "should be rare." *Stewart*, 790 F.2d at 629.[6] The use of "oral testimony at the

---

[6] Our decision in *Stewart v. RCA Corp.*, 790 F.2d 624 (7th Cir. 1986), was based on Rule 43(e), which stated as follows: "When a motion is based on facts not appearing of record[,] the court may hear the matter on affidavits

(continued...)

summary judgment stage creates a strong temptation for a judge to assess the witness'[s] credibility," an impermissible role for a judge ruling on a summary-judgment motion. *Seamons*, 206 F.3d at 1026.

Beyond the general point that oral testimony is discouraged at the summary-judgment stage, here the request to present oral testimony or a supplemental affidavit was unaccompanied by an offer of proof. The bankruptcy judge was not told what Claimant A-49 would say to amplify his earlier affidavit. Under these circumstances the judge can hardly be faulted for declining to allow an expansion of the record. Even now, the substance of the proposed additional testimony remains a mystery. The claimant's counsel has not shed any light on what the supplemental proofs would show if we reversed and remanded to permit further development of the record. The bankruptcy judge was well within her discretion to proceed to decision without reopening the factual record.

For these reasons, the fraudulent-inducement claim fails, the settlement agreement is binding and enforceable, and the bankruptcy court properly disallowed the claim.

AFFIRMED.

---

[6] (...continued)

presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or depositions." FED. R. CIV. P. 43(e) (1982). This formulation was amended as part of the 2007 amendments to the Federal Rules of Civil Procedure. The amendment was stylistic only. *See* FED. R. CIV. P. 43 advisory committee's note.